UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ELECTRONICS AND TELECOMMUNICATIONS  :  Case No.:  15 CV 3419 (VSB) (BMM)
RESEARCH INSTITUTE,                                                    :
                                                                                         :
                                          Plaintiff,                           :
                                                                                         :
                          -against-                                          :
                                                                                         :
ACACIA RESEARCH GROUP, LLC, formerly             :
known as ACACIA PATENT ACQUISITION          :
LLC,                                                                               :
                                                                                         :
                                          Defendant.                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**DECLARATION OF MATTHEW VELLA IN SUPPORT OF DEFENDANT'S
OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

I, Matthew Vella, hereby declare:

1.      I have personal knowledge of the facts set forth in this declaration and, if called to testify as a witness thereto, I could and would competently do so.

2.      I have been a licensed attorney since 1999.  For the past 17 years, my work has included patent licensing and enforcement.

3.      I am the former President and CEO of Acacia Research Group, LLC ("Acacia") and am currently a consultant to Acacia.  I was an Acacia employee from November 2006 to December 2015.  I joined the company as Vice President of Licensing and was appointed to Senior Vice President of Licensing in October 2007.  I was appointed to Executive Vice President of Licensing in October 2011.  While a licensing executive, my primary responsibilities included advising Acacia in its acquisition of patent rights from various patent holders and directing patent licensing and enforcement efforts on behalf of Acacia and several of its subsidiaries.  I was appointed to President in August 2012 and assumed the office of CEO in August 2013.

4.      For at least the past 15 years, Acacia and its subsidiaries have specialized exclusively in patent licensing and enforcement.  Using its legal and technical expertise, Acacia researches and acquires patent rights from inventors or other patent holders, typically in the form of a patent assignment agreement or exclusive license agreement, for the purpose of monetizing the patents through licensing and enforcement against third parties Acacia identifies as potential infringers.  As a result of its efforts, Acacia has returned hundreds of millions of dollars to the hundreds of patent holders from whom it has acquired patent rights.  Many of those patent holders are individuals, small businesses, or educational or other institutions that come to Acacia because they do not have the expertise or resources necessary to protect and realize value from their patented technologies.

5.      Acacia and its subsidiaries own or control the patent rights that they license and enforce.  Acacia and its subsidiaries have owned or controlled thousands of

-1-

U.S. and foreign patents and related rights covering technologies used in a wide range of industries, examples of which include social networking, computer-aided design, wireless networking, automotive navigation and diagnostics, orthopedic surgery, broadband communications, fiber optic network architecture, consumer electronics, ceramic hip replacement, aviation, software, geological interpretation and modeling, data networking, stent grafts, vena cava filters, online gaming, semiconductors, ink jet printing, display back-lighting, optical networking and switching, improved lighting, smartphones, embedded links in online media, microprocessing, insulation, speech codecs, radio frequency modulation, and super resolution microscopy.  Acacia and its subsidiaries currently own or control approximately 9,912 patents.

6.      Following acquisition of a patent portfolio, Acacia typically assigns all of its rights and obligations concerning the portfolio to one or more wholly-owned subsidiaries, which are then responsible for licensing and enforcement efforts concerning that portfolio.  As just two examples, one of Acacia's subsidiaries owns or controls patents concerning vascular stent graft technology, whereas another owns or controls patents concerning business intelligence database software.

7.      One of the hundreds of patent holders that have transferred patent rights to Acacia is Electronics and Telecommunications Research Institute ("ETRI").  On or around January 14, 2010, Acacia and ETRI entered into the first of two exclusive license agreements (the "Agreements") under which Acacia acquired exclusive rights to sublicense and enforce patents and patent applications held by ETRI (the "Patents" or the "ETRI Portfolio").  On or around May 7, 2010, Acacia and ETRI entered into the second of the Agreements.  The first Agreement concerned approximately 134 Patents relating primarily to optical, radio, cable, and satellite communications systems.  The second Agreement concerned an additional 12 Patents relating to video encoding technology.  Overall, the ETRI Portfolio contained 54 U.S. Patents and 92 foreign Patents.

8.      On or around November 15, 2010, Acacia assigned its rights and

obligations under the second Agreement to its wholly-owned subsidiary Advanced

Encoding Solutions, LLC ("AES").  On or around April 25, 2011, Acacia assigned rights

rights and obligations under the first Agreement to its wholly-owned subsidiary Satellite

Access Technologies, LLC ("SAT").

9.      Between approximately November 2006 and August 2012, I was among

the licensing executives responsible for directing efforts to license and enforce several of

the patent portfolios Acacia had acquired from various patent holders.  In or around April

2010, I was assigned as the licensing executive responsible for directing efforts to license

and enforce the ETRI Portfolio.

10.      On or around January 14, 2011, after analyzing ETRI Patents for potential

infringement by products manufactured or sold by various third parties, AES filed a civil

action alleging infringement of certain ETRI Patents against several companies in the

U.S. District Court for the Eastern District of Texas, entitled *Advanced Encoding

Solutions, LLC v. Broadcom Corporation, et al.*, No. 6:11-cv-24.  As a result of

settlements in that action, under which AES licensed ETRI Patents to the settling

defendants, AES received collective "Total Recoveries" of ███████ from the settling

defendants, as that term is defined in the Agreements.  AES realized "Net Proceeds" of

███████ as that term is defined in the Agreements.  AES allocated 50% of that

amount, or ███████, to ETRI and paid ETRI ████████████████████

████████████ as required under the Agreements.  AES did not file any other

actions alleging infringement of ETRI Patents and did not otherwise license or enforce

ETRI Patents against third parties.  As a result, AES did not receive any further Total

Recoveries.

11.      SAT analyzed other ETRI Patents but was unable to identify any products

manufactured or sold by third parties that it believed were using ETRI's patented

technologies without authorization.  As a result, SAT did not license or enforce ETRI

Patents against any third parties, and did not receive any Total Recoveries.

12.     I also had or shared responsibility for negotiating Acacia's multi-portfolio agreements, or "Global Agreements," with several companies beginning in 2009.  In each instance my responsibilities included helping to identify which patents owned or controlled by Acacia and its subsidiaries were potentially infringed by the counter-party for use in negotiations with the counter-party.  The counter-parties to the various Global Agreements included ███████████████████████████████████████ ████████████████████████████████████████████████████ The purpose of each Global Agreement was to address, to one degree or another, all disputes between the parties arising from Acacia's belief that the counter-party was infringing certain patents in multiple Acacia portfolios, without the need for continuing, or initiating, litigation concerning those portfolios against the counter-party.  A common element of the Global Agreements was █████████████████████████████ ████████████████████████████████████████████ ██████████████████████

13.     Acacia's negotiations with █████ arose from or involved pursuit of ██████ for infringement of other patents in some of Acacia's other portfolios, including patents concerning application server technology and computer network management.  The negotiations resulted in the parties entering into an ████████████████████ ██████████████████████████████████ Acacia and ██████ later entered into two amendments to the ██████ Global Agreement dated March 1, 2010 and March 31, 2010, respectively.  Those amendments to the ██████ Global Agreement are attached hereto as **Exhibit A** and **Exhibit B**, respectively.

14.     ██████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████ At that time, Acacia and its subsidiaries owned or controlled more than 120 different patent portfolios, one of which was the ETRI Portfolio. ████████████████████████████████

"Schedule A" to the ████ Global Agreement, which listed the "Acacia Patents" as defined in the ████ Global Agreement.  Acacia had identified approximately 10 of its patent portfolios that it believed ████ was infringing, and █████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

     15.     On March 9, 2010, Acacia sent its notice of acceptable completion of due diligence to ETRI under the parties' first Agreement.  A true and correct copy of the notice is attached hereto as **Exhibit C**.

     16.     Acacia and ████ signed the second amendment ██████████

████ on or around March 31, 2010.  Among other things, the second amendment

████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████

     17.     I never believed that ████ manufactured or sold products that potentially infringed any ETRI Patents.  Acacia never asserted any of the Patents against ████ through an enforcement action or otherwise.  To my knowledge, no one else at Acacia believed that ████ manufactured or sold products that potentially infringed any of the Patents.  The patents that Acacia presented to ████ during negotiations as those it believed ████ infringed did not include any ETRI Patents.  I had every incentive to present to ████ any patents I believed ████ potentially infringed in order to negotiate a higher payment from ████.

18.     Acacia subsequently  ███████████ ███████████ The proceeds did not include any "Total Recoveries," as that term is defined in Acacia's Agreements with ETRI, because the proceeds were not received as a result of any licensing or enforcement of ETRI Patents.

19.     In April 2010, ETRI and Acacia were negotiating their second Agreement. On April 14, 2010, my colleague at Acacia, Jonathan Taub, sent an email to Joong-Won Cho, ETRI's in-house Patent Counsel and principal negotiator for both Agreements, attaching a markup of the draft second Agreement that proposed adding Section 4.3, which disclosed certain information about the recently consummated ████ Global Agreement.  A true and correct copy of Mr. Taub's April 14, 2010 email to Mr. Cho (copying me), and the attachments thereto, are attached hereto as **Exhibit D**.

20.     Later on April 14, 2010, Mr. Taub and I had a phone call with Mr. Cho to discuss the proposed Section 4.3.  On that call, Mr. Taub and I identified ████ as the counter-party to the agreement referenced in Section 4.3.  I told Mr. Cho that Acacia did not believe ████ was infringing any ETRI Patents.  I explained to Mr. Cho that, as a result, although Acacia had █████████████████████ █████████████████ did not trigger any of Acacia's obligations to ETRI under the Agreements.  Mr. Cho said he understood our explanation of why the ████ Global Agreement did not impact Acacia's obligations to ETRI and that Acacia had no obligations to ETRI concerning companies that Acacia did not believe were infringing ETRI Patents.  I told Mr. Cho that Acacia was concerned that even if it were correct that ████ did not infringe ETRI Patents, ETRI would later █████████████████ incorrectly claim that Acacia owed ETRI proceeds received under the ████ Global Agreement anyway.  Mr. Cho told me he understood those concerns and assured me that ETRI would not demand any proceeds that Acacia received from companies that Acacia did not believe were infringing ETRI Patents.

21.     Shortly after our call, Mr. Cho sent an email to Mr. Taub and me

confirming our discussion.  Mr. Cho said, in part:  "As for the added section 4.3, I completely understand your background.  But, I think it might delay the process of getting approval of our President even though it does not impact anything.  In per Agreement [sic], APAC will have exclusive right to grant sublicense except the companies of Exhibit A/C.  Accordingly, I don't think we need to include the 4.3 in the agreement.  Practically, if you don't want to enforce against some companies, ETRI will have no way to enforce against them.  The case you are concerned about will never happen."  A true and correct copy of Mr. Cho's April 14, 2010 email to Mr. Taub and me is attached hereto as **Exhibit E**.

22.     In reliance on Mr. Cho's assurances on behalf of ETRI in the phone call and email described above, Acacia agreed not to include Section 4.3 in the second Agreement, which the parties entered into on May 7, 2010.  But for Mr. Cho's assurances on behalf of ETRI, Acacia would not have entered into the second Agreement.



23.     Acacia's negotiations with ▮▮▮▮▮ arose from or involved pursuit of ▮▮▮▮▮ for infringement of other patents in some of Acacia's other portfolios, including patents concerning, among other things, smartphone technology.  The negotiations resulted in the parties entering into an ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮

24.     The ▮▮▮▮ Global Agreement ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  At that time, Acacia and its subsidiaries owned or controlled approximately 150 different patent portfolios, one of which was the ETRI Portfolio.  ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Acacia had identified approximately 15 of its patent portfolios that it believed ▮▮▮▮▮ was infringing, and

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████

25.     I never believed that ██████ manufactured or sold products that potentially infringed any ETRI Patents.  Acacia never asserted any of the Patents against ██████ through an enforcement action or otherwise.  To my knowledge, no one else at Acacia believed that ██████ manufactured or sold products that potentially infringed any of the Patents.  The patents that Acacia presented to ██████ during negotiations as those it believed ██████ infringed did not include any ETRI Patents.  I had every incentive to present to ██████ any patents I believed ██████ potentially infringed in order to negotiate a higher payment from ██████

26.     Acacia subsequently ████████████████████████████ ████████████████████████████  The proceeds did not include any "Total Recoveries," as that term is defined in Acacia's Agreements with ETRI, because the proceeds were not received as a result of any licensing or enforcement of ETRI Patents.

27.     Acacia's negotiations with ██████ arose from or involved pursuit of ██████ for infringement of other patents in some of Acacia's other portfolios, including patents concerning, among other things, power management in notebook computers.  The negotiations resulted in the parties entering into an █████████████████████ █████████████████████

28.     The ██████ Global Agreement █████████████████████ █████████████████████████████████ ██████████████████████████████  At that time, Acacia and its subsidiaries owned or controlled more than 171 different patent

portfolios, one of which was the ETRI Portfolio. ███████████████████

████████████████████████████████████████████████

███████████████████████████████ Acacia had identified

approximately 12 of its patent portfolios that it believed ██████ was infringing, ██

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

29.      I never believed that ████████ manufactured or sold products that

potentially infringed any ETRI Patents.  Acacia never completed an analysis of ████████

for potential infringement of the Patents because Exhibit A to Acacia's Agreements with

ETRI stated that Acacia ██████████████████████████████████

█████████████████████████████████████████

████████████████████ Acacia never asserted any of the Patents against

██████████ through an enforcement action or otherwise.  To my knowledge, no one else at

Acacia believed that ████████ manufactured or sold products that potentially infringed

any of the Patents.  The patents that Acacia presented to ████████ during negotiations as

those it believed ████████ infringed did not include any ETRI Patents.

30.      Acacia subsequently ███████████████████████████

████████████████████████ The proceeds did not include any "Total

Recoveries," as that term is defined in Acacia's Agreements with ETRI, because the

proceeds were not received as a result of any licensing or enforcement of ETRI Patents.

31.      Acacia's negotiations with ████████ arose from or involved pursuit of ██

████████ for infringement of patents in some of Acacia's other portfolios, including patents

concerning semiconductor memory technology.  The negotiations resulted in the parties

entering into a ███████████████████████████████████████████████
███████████████████████████████████   At that time, Acacia and its
subsidiaries owned or controlled more than 200 different patent portfolios, one of which
was the ETRI Portfolio.  Acacia had identified four patent portfolios that it believed ██
████   was infringing, ████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████

     32.     I never believed that ██████████ manufactured or sold products that
potentially infringed any ETRI Patents.  Acacia never completed an analysis of ██████████
for potential infringement of the Patents because Exhibit A to Acacia's Agreements with
ETRI stated that Acacia ██████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████   Acacia never asserted any of the Patents against
██████████ through an enforcement action or otherwise.  To my knowledge, no one else at
Acacia believed that ██████████ manufactured or sold products that potentially infringed
any of the Patents.  The patents that Acacia presented to ██████████ during negotiations as
those it believed ██████████ infringed did not include any ETRI Patents.

     33.     Acacia subsequently ████████████████████████████████████
████████████████████████████████████   The proceeds did not include any "Total
Recoveries," as that term is defined in Acacia's Agreements with ETRI, because the
proceeds were not received as a result of any licensing or enforcement of ETRI Patents.

     34.     Acacia's negotiations with ██████ arose from or involved pursuit of ██████████
for infringement of other patents in some of Acacia's other portfolios, including patents
concerning, among other things, disk drive interface technology.  The negotiations
resulted in the parties entering into a ████████████████████████████████████████
████████████████████████████████████████████████████████████████

-10-

█████████

35.    The █████████ Agreement ██████████████████████████
████████████████████████████ At that time, Acacia and its
subsidiaries owned or controlled more than 200 different patent portfolios, one of which
was the ETRI Portfolio.  Acacia had identified approximately 10 of its patent portfolios
that it believed ████ was infringing, ██████████████████████
██████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████
██████████████████████████████

36.    I never believed that ████ manufactured or sold products that potentially
infringed any ETRI Patents.  Acacia never asserted any of the Patents against ████
through an enforcement action or otherwise.  To my knowledge, no one else at Acacia
believed that ████ manufactured or sold products that potentially infringed any of the
Patents.  The patents that Acacia presented to ████ during negotiations as those it
believed ████ infringed did not include any ETRI Patents.  I had every incentive to
present to ████ any patents I believed ████ potentially infringed, in order to negotiate a
higher payment from ████.

37.    Acacia subsequently ████████████████████████
██████████████████████ The proceeds did not include any "Total
Recoveries," as that term is defined in Acacia's Agreements with ETRI, because the
proceeds were not received as a result of any licensing or enforcement of ETRI Patents.

38.    Acacia's negotiations with ████ arose from or involved pursuit of
████ for infringement of other patents in Acacia's other portfolios concerning
orthopedics and sports medicine.  The negotiations resulted in the parties entering into a
██████████████████████████████████████
████████████████████ At that time, Acacia and its subsidiaries owned or

controlled more than 250 different patent portfolios, one of which was the ETRI

Portfolio.  Under the ███████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

     39.    I never believed that ████ manufactured or sold products that

potentially infringed any ETRI Patents.  Acacia never asserted any of the Patents against

████ through an enforcement action or otherwise.  To my knowledge, no one else at

Acacia believed that ████ manufactured or sold products that potentially infringed any

of the Patents.  The patents that Acacia presented to ████ during negotiations as those

it believed ████ infringed did not include any ETRI Patents.  I had every incentive to

present to ████ any patents I believed ████ potentially infringed, in order to

negotiate a higher payment from ████

     40.    Acacia subsequently ███████████████████████

████████████████████ The proceeds did not include any "Total

Recoveries," as that term is defined in Acacia's Agreements with ETRI, because the

proceeds were not received as a result of any licensing or enforcement of ETRI Patents.

     41.    Acacia's negotiations with ████ arose from or involved pursuit of ████

for infringement of other patents in Acacia's other portfolios, including those concerning

smartphones and related wireless and mobile device technologies.  The negotiations

resulted in those parties entering into a ████████████████████████

████████████████████████████████████████

████████ At that time, Acacia and its subsidiaries owned or controlled more than

250 different patent portfolios, one of which was the ETRI Portfolio.

     42.    The ████████ Agreement was entered into ████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████

43.     I never believed that ████ manufactured or sold products that potentially infringed any ETRI Patents.  Acacia never asserted any of the Patents against ████ through an enforcement action or otherwise.  To my knowledge, no one else at Acacia believed that ████ manufactured or sold products that potentially infringed any of the Patents.

44.     None of the proceeds Acacia received under the ████████ Agreement were received as a result of any licensing or enforcement of ETRI Patents.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct and that this declaration was executed this 30th day of June, 2016, in Laguna Beach, California.

_____
Matthew Vella

-13-

**CERTIFICATE OF SERVICE**

I certify that on July 1, 2016, the foregoing document:

**DECLARATION OF MATTHEW VELLA IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

was served electronically on all parties or their counsel of record.

_s/ Travis P. Brennan_
Travis P. Brennan