UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒:

ELECTRONICS AND TELECOMMUNICATIONS :   Case No.:  15 CV 3419 (VSB) (BMM)
RESEARCH INSTITUTE,                              :
                                          :   ECF Case
                   Plaintiff,            :
                                          :
                  -against-          :
                                          :

ACACIA RESEARCH GROUP, LLC, formerly :
known as ACACIA PATENT ACQUISITION :
LLC,                                           :
                                          :
                  Defendant.      :

‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒:

## <u>DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED</u>

## <u>MATERIAL FACTS</u>

      Pursuant to Local Rule 56.1(b), Defendant Acacia Research Group, LLC ("Acacia"

or "Defendant") hereby responds to the material facts set forth in paragraphs 1 through 23

of Plaintiff Electronics and Telecommunications Research Institute's ("ETRI") Statement

of Undisputed Material Facts, and also states additional material facts 24 through 61, as to

which it is contended that there exists a genuine issue to be tried:

      1.     Defendant, Acacia Research Group, LLC, formerly known as Acacia Patent

Acquisition LLC ("Acacia"), licenses and enforces patents on behalf of patent holders.

(Affirmation of David G. Ebert ("Ebert Aff."), Exhibit ("Ex.") I, at F-9.)

      <u>Acacia's Response to No. 1</u>:  **Disputed**.  Acacia's operating subsidiaries license and

enforce patent rights that they own or control.  For example, Acacia subsidiary Advanced

Encoding Solutions, LLC ("AES") enforced patents on behalf of itself in its own name, not

on behalf of ETRI.  (Declaration of Matthew Vella ("Vella Decl.") ¶ ¶ 5, 10.)

2.     According to the 2015 annual report filed by Acacia's parent company,

Acacia Research Corporation:

> [Acacia Research Corporation's ("ARC")] operating subsidiaries invest in, license and enforce patented technologies. [ARC's] operating subsidiaries partner with inventors and patent owners, applying their legal and technology expertise to patent assets to unlock the financial value in their patented inventions.
>
> *       *       *
>
> In general, revenue arrangements provide for the payment of contractually determined fees in consideration for the grant of certain intellectual property rights for patented technologies owned or controlled by [ARC's] operating subsidiaries. These rights typically include some combination of the following: (i) the grant of a non-exclusive, retroactive and future license to manufacture and/or sell products covered by patented technologies owned or controlled by our operating subsidiaries, (ii) a covenant-not-to-sue, (iii) the release of the licensee from certain claims, and (iv) the dismissal of any pending litigation.

(Ebert Aff., Exhibit ("Ex.") I, at F-9.)

Acacia's Response to No. 2:  **Disputed**.  The description of Acacia's "Patent

Licensing and Enforcement Business" in "Part I"of the 2015 annual report filed by Acacia

Research Corporation states, in part:

> Our operating subsidiaries invest in, license and enforce patented technologies.  Our operating subsidiaries partner with inventors and patent owners, applying our legal and technology expertise to patent assets to unlock the financial value in their patented inventions.  We are an intermediary in the patent marketplace, bridging the gap between invention and application, facilitating efficiency and delivering monetary rewards to patent owners.
>
> Our operating subsidiaries generate revenues and related cash

flows from the granting of intellectual property rights for the use of patented technologies that our operating subsidiaries control or own. Our operating subsidiaries assist patent owners with the prosecution and development of their patent portfolios, the protection of their patented inventions from unauthorized use, the generation of licensing revenue from users of their patented technologies and, where necessary, with the enforcement against unauthorized users of their patented technologies through the filing of patent infringement litigation.

…

We are a leader in patent licensing and enforcement and our operating subsidiaries have established a proven track record of licensing success with more than 1,490 license agreements executed to date. On a consolidated basis, to date, we have generated revenues from 185 patent portfolio licensing and enforcement programs. Our professional staff includes in-house patent attorneys, licensing executives, engineers and business development executives.

We partner with the disenfranchised patent owner, including individual inventors, universities, and large multi-national corporations in the technology, medical technology, energy, and industrial sectors. A disenfranchised patent owner owns patents that are being infringed by third-parties in connection with the design, manufacture, use, or distribution of products and/or services, but is not receiving fair compensation for the unauthorized use of his or her patented inventions by those third-parties. We strive to reward inventors and patent owners for their creative technological contributions. We also partner with patent owners, including individual inventors, universities, and domestic and multi-national corporations who may have limited internal resources and/or expertise to effectively address the unauthorized use of their patented technologies, and those that are seeking to effectively and efficiently monetize their portfolio of patented technologies on an outsourced basis. In a typical arrangement, our operating subsidiary will partner with a patent portfolio owner, acquiring rights in the patent portfolio or acquiring the patent portfolio outright, and in exchange, the original patent portfolio owner receives (i) a percentage of our operating subsidiary's net recoveries from the licensing and enforcement of the patent portfolio, which we refer to as our Partnering Model, or (ii) an upfront payment for the purchase of the patent portfolio rights or the patent portfolio, which we

refer to as our Purchasing Model, or (iii) a combination of the two, which we refer to as our Hybrid Partnering Model.

Under U.S. law, a patent owner has the right to exclude others from making, selling or using their patented invention. A third-party infringes a patent by making, offering for sale, selling, or using a patented invention without a license from the patent owner. Unfortunately, in the majority of cases, infringers are generally unwilling, at least initially, to negotiate or pay reasonable license fees for their unauthorized use of third-party patents and will typically fight any allegations of patent infringement. Inventors and/or patent holders without sufficient legal, financial and/or expert technical resources to bring and continue the pursuit of costly and complex patent infringement actions are often blatantly ignored.

As a result of the common reluctance of patent infringers to negotiate and ultimately take a patent license for the use of patented technologies without at least the threat of legal action, patent licensing and enforcement often begins with the filing of patent enforcement litigation. However, most patent infringement litigation settles out of court at amounts that are related to the strength of the patent and the value of the invention in the infringer's products or services. We execute agreements that grant rights in our patents to users of our patented technologies. Our agreements can be negotiated without the filing of patent litigation, or negotiated in the shadow of ongoing patent litigation, depending on the specific facts and circumstances.

Patents are a complex and highly technical subject area. Our professionals actively seek to identify high-quality but undervalued patent portfolios in a variety of industries. We combine our legal expertise, technology expertise, and our extensive knowledge of, and experience in, the patent licensing ecosystem, to continually uncover important patent assets and bring needed proficiency to patent licensing and enforcement.

Our partnership with patent owners is the cornerstone of our operating subsidiaries' corporate strategy. We assume all responsibility for advancing operational expenses while pursuing a patent licensing and enforcement program, and then share net licensing revenue with our patent partners as that program matures, on a pre-arranged and negotiated basis. We may also provide upfront capital to the patent owner as an

> advance against future licensing revenue. We are a principal in the licensing and enforcement effort, with our operating subsidiaries obtaining control of the rights in the patent portfolio, or control of the patent portfolio outright.

(Declaration of Travis P. Brennan ("Brennan Decl.") ¶ 2, Ex. A.)

3.      ETRI, a South Korean government-funded research institute, owns the ETRI Patents.  (Ebert Aff., Ex. A, at 1.)

Acacia's Response to No. 3:  **Disputed**.  Under the parties' Exclusive License Agreements (the "Agreements"), Acacia or its subsidiaries, not ETRI, owned all substantial rights in and to the ETRI patents (the "Patents" or the "ETRI Portfolio").  (Ebert Aff. ¶ 2, Ex. A at § 1.1.)

4.      ETRI and Acacia entered into two Exclusive License Agreements, dated January 14, 2010 and May 7, 2010, respectively (jointly, the "ETRI/Acacia Agreements") (Ebert Aff., Ex. A.)

Acacia's Response to No. 4:  **Disputed**.  The "Effective Dates" of the Agreements were January 14, 2010 and May 7, 2010, respectively.  Under Section 1.1 of the Agreements, Acacia's acquisition of rights in ETRI Patents was subject to Acacia's acceptable completion of due diligence under Section 1.3 of the Agreements.  (Ebert Aff. ¶ 2, Ex. A at p. 1 and §§ 1.1, 1.3.)

5.      Under Section 1.1 of the ETRI/Acacia Agreements, ETRI assigned to Acacia the worldwide exclusive license rights to the ETRI Patents, including the right to sublicense and enforce the ETRI Patents.  (Ebert Aff., § 1.1.)

Acacia's Response to No. 5:  **Disputed**.  Section 1.1 of the Agreements states:

> Effective immediately upon the date of Acceptable Completion as set forth in Section 1.3 below, [ETRI] grants to [Acacia] all substantial rights in and to the Patents including the worldwide, exclusive right and license under the Patents to

make, have made, use, import, offer or sell products or services covered by the Patents, including the exclusive right to grant sublicenses, to sue for and collect past, present and future damages and to seek and obtain injunctive or any other relief for infringement of the Patents.  Except as expressly set forth in this Agreement, [ETRI] retains no rights in or to the Patents, including without limitation, the right to sue for and collect past, present and future damages or to seek and obtain injunctive or any other relief for infringement of the Patents and specifically grants APAC all such rights for the term as set forth in Section 7 below."

(Ebert Aff. ¶2, Ex. A at § 1.1.)

6.      In exchange, Acacia agreed in Section 3.1 of the ETRI/Acacia Agreements to pay ETRI 50% of the net proceeds ("Net Proceeds") Acacia obtained from its licensing and enforcement of the ETRI Patents.  (Ebert Aff., Ex. A, § 3.1.)

Acacia's Response to No. 6:  **Disputed**.  Acacia agreed to pay ETRI 50% of "Net Proceeds," which are defined as "Total Recoveries less the APAC Costs."  "Total Recoveries" are defined as "all amounts actually received by APAC from the licensing and enforcement of the Accepted Patents including all licensing proceeds and recoveries from any lawsuits or settlements."  (Ebert Aff. ¶ 2, Ex. A at § 3.1.)

7.      "Net Proceeds" is defined in Section 3.1 of the ETRI/Acacia Agreements as the "Total Recoveries" obtained by Acacia from the licensing and enforcement of the ETRI Patents, less third-party costs and expenses.   (Ebert Aff., Ex. A, § 3.1.)

Acacia's Response to No. 7:  **Disputed**.  "Net Proceeds," are defined as "Total Recoveries less the APAC Costs."  "Total Recoveries" are defined as "all amounts actually received by APAC from the licensing and enforcement of the Accepted Patents including all licensing proceeds and recoveries from any lawsuits or settlements."  (Ebert Aff. ¶ 2, Ex. A at § 3.1.)

8.      "Total Recoveries" is defined in Section 3.1 as "all amounts actually received

by [Acacia] from the licensing and enforcement of the [ETRI] Patents including all licensing proceeds and recoveries from any lawsuits or settlements."  (Ebert Aff., Ex. A, § 3.1.)

       Acacia's Response to No. 8:  **Undisputed**.

       9.     The word "infringement" nowhere appears in Section 3 of the Agreements, entitled CONSIDERATION, which includes the methodology for calculating royalty payments, as well as the definitions of Total Recoveries and Net Proceeds.  (See Ebert Aff., Ex. A, § 3.)

       Acacia's Response to No. 9:  **Disputed**.  "CONSIDERATION" is the heading for Section 3 of the Agreements.  Section 11.5 of the Agreements provides:  "The headings contained in this Agreement have been inserted for convenient reference only and shall not modify, define, expand or limit any of the provisions of this Agreement."  Section 6.1 of the Agreements states, in part, that:  "[Acacia] will use its good faith efforts to pursue licensing and enforcement of the [ETRI] Patents at its expense . . . [Acacia] will attempt to negotiate licenses with companies that [Acacia] believes may be infringing the [ETRI] Patents."  Section 6.2 of the Agreements states, in part, that:  "[Acacia] may, in its sole judgment, decide to institute enforcement actions against any or all of the companies that [Acacia] believes are infringing the [ETRI] Patents."  (Ebert Aff. ¶ 2, Ex. A at §§ 3, 6.1, 6.2, 11.5.)

       10.     Between December 2009 and April 2013, Acacia entered into agreements (the "Third-Party Agreements") in which it granted rights in the ETRI Patents to various corporations, including ███████████████████████████████ (each, a "Counterparty").  (See Ebert Aff., Exs. B - H.)

       Acacia's Response to No. 10:  **Disputed**.  AES entered into agreements with Broadcom Corporation and Ericsson Television, Inc. to settle claims against those companies

for infringement of ETRI Patents.  Separately, Acacia entered into certain multi-portfolio

agreements, or "Global Agreements," with ████████████████████████████████

████████████████████████████████████████████████████████████████

████████ granting various rights in many different patent portfolios owned or controlled by

Acacia and its subsidiaries.  Acacia did not own or control rights in any ETRI Patents when it

entered into the ████████ Global Agreement in December 2009 (the "████████ Global

Agreement").  (Vella Decl. ¶¶ 10, 12 – 14, 16 – 18, 23 – 44; Vella Decl. ¶ 15, Ex. C; Ebert

Aff., Exs. B – H.)

   11.  Under the Third-Party Agreements, Acacia granted each Counterparty

covenants not to sue in the ETRI Patents (the "Covenants").  (Ebert Aff., Ex. B, § A2.2; Ex.

C, § A2.2; Ex. D, § A2.2; Ex. E, § A2.2, Ex. F, § 2.3; Ex. G, § 2.5; Ex. H, § 2.2.)

   <u>Acacia's Response to No. 11</u>:  **Disputed**.  Under the agreements with Broadcom and

Ericsson, AES licensed ETRI patents to those companies.  Under each of the "Global

Agreements," with the exception of the ████████ Global Agreement, Acacia ████████████

████████████████████████████████████████████████████████████████

████████████.  In the ████████ Global Agreement, Acacia ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████.  In each Global Agreement,

Acacia ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████ subject to the terms of the Global Agreements.  (Vella Decl. ¶¶ 10, 12 – 14, 16

– 18, 23 – 44; Vella Decl. ¶ 13, Ex. B at § A2.2 and Sub-Exhibit A.1; Ebert Aff. Ex. B at §§ A2.1 and A2.2; Ex. C at § A2.2 and Sub-Exhibit A.1; Ex. D § at A2.2 and Sub-Exhibit A-1; Ex. E at § A2.2; Ex. F at § 2.2; Ex. G at § 2.5; Ex. H at § 2.2.  )

12.     In structuring the Third-Party Agreements, Acacia ███████████████

███████████████████████████████████████████████████████████████

███████████████████  (Ebert Aff., Ex. B, §§ A1.2, A1.3; Ex., C, §§ A1.2, A1.3; Ex., D, §§ A1.2, A1.3; Ex. E, §§ A1.6, A1.7; Ex. F, §§ 1.2, 1.5.)

Acacia's Response to No. 12: **Disputed**.  Only the ███████████ and ███ Global Agreements ██████████████████████████████████

████████████  (Ebert Aff., Ex. B, §§ A1.2, A1.3; Ex., C, §§ A1.2, A1.3; Ex., D, §§ A1.2, A1.3; Ex. E, §§ A1.6, A1.7; Ex. F, §§ 1.2, 1.5; Ex. G at 1-3; Ex. H at 1-5)

13.     Acacia granted ███████████████████████████████

███████████████████████████████████████████████████████████████

███████  (*Id.*)

Acacia's Response to No. 13: **Disputed**.  Only the ███████ and ███ Global Agreements ██████████████████████████████████

████████████  (Ebert Aff., Ex. B, §§ A1.2, A1.3; Ex., C, §§ A1.2, A1.3; Ex., D, §§ A1.2, A1.3; Ex. E, §§ A1.6, A1.7; Ex. F, §§ 1.2, 1.5; Ex. G at 1-3; Ex. H at 1-5.)

14.     Each of the Third-Party Agreements (except the ██████ agreement) recites that ████████████████████████████████████████████ granted by the Third-Party Agreements.  (Ebert Aff., Ex. F, at 1; Ex. H, at 1; Ex. B, at 1; Ex. E, at 1; Ex. D, at 1; Ex. C, at 1.)

Acacia's Response to No. 14: **Disputed**.  The ██████ Global Agreement does not

██████████████████████████████████████████████████████ (Ebert Aff. ¶ 9, Ex. H at p. 1.)

15.     Each of the Third-Party Agreements (except the ████████ agreement) ████████ ██████████████████████████████████████████████████████ granted by the Third-Party Agreements.  (Ebert Aff., Ex. F, § 4.1; Ex. B, § 2.1; Ex. C, § 2.1; Ex. D, § 2.1; Ex. G, § 5.1; Ex. H, § 8.2.)

Acacia's Response to No. 15:  **Disputed**.  The ████ Global Agreement does not ██████████████████████████████████████████████████████ (Vella Decl. ¶ 42; Ebert Aff. ¶ 9, Ex. H at p. 1 and § 8.)

16.     Under each Third-Party Agreement (other than those with ████████ ████████ Acacia ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████. (Ebert Aff., Ex. B, § A2.2; Ex. C, § A2.2; Ex. D, § A2.2; Ex. E, § A2.2; Ex. F, § 2.4.)

Acacia's Response to No. 16:  **Disputed**.  The Global Agreements ████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ (Ebert Aff. Exs. B – H.)

17.     In addition, if a Counterparty (other than ████████ and ████████ ████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████ (Ebert Aff., Ex. B, § A2.2; Ex. C, § A2.2; Ex. D, § A2.2; Ex. E, § A2.2; Ex. F, § 2.4.)

<u>Acacia's Response to No. 17</u>:  **Disputed**.  The Global ███████████

██████████████████████████████████████████████████████████

████████████████████████████████████████.  (Ebert Aff. Exs. B – H.)

18.     The Third-Party Agreement between Acacia and ██████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████.  (*See* Ebert Aff., Ex. F, §§ 1.3, 1.5, 1.11, 1.14, 2.1.)

<u>Acacia's Response to No. 18</u>:  **Disputed**.  The Global Agreements ██████

██████████████████████████████████████████████████████████

██████████████████████████████████.  (Ebert Aff. Exs. B – H.)

19.     Acacia received at least ██████████ under the Third-Party Agreements ████

███████████████████████████████████ (Ebert Aff., Ex. B, § 2.1; Ex. C, §

2.1, A1.8; Ex. D, § 2.1; Ex. E, § A4.1; Ex. F, § 4.1; Ex. G, § 5.1; Ex. H, § 8.1.)

<u>Acacia's Response to No. 19</u>:  **Disputed**.  Each counterparty to the Global

Agreements received, among other things:███████████████████████████

███████████████████████.  Acacia never asserted ETRI Patents against

those counterparties through an enforcement action or otherwise because Acacia never

believed those counterparties were infringing ETRI Patents.  The proceeds Acacia received

under the Global Agreements did not include any proceeds "actually received by [Acacia]

from the licensing and enforcement of [ETRI] Patents."  (Vella Decl. ¶¶ 12 – 14, 16 – 18, 23

– 44; Ebert Aff. Ex. A at § 3.1;  Ex. B at §§ A2.2 and Sub-Exhibit A.1; Ex. C at § A2.2 and

Sub-Exhibit A.1; Ex. D at § A2.2 and Sub-Exhibit A-1; Ex. E at § A2.2; Ex. F at § 2.2; Ex. G

at § 2.5; Ex. H at § 2.2.)

    20.    Each of the ███████ that Acacia granted ████████████████████

█████████████████████████████. (Ebert Aff., Ex. B, § A2.2; Ex. C, §

A2.2; Ex. E, § A2.2; Ex. G, § A2.5; Ex. H, § A2.2.)

    Acacia's Response to No. 20: **Disputed**. The ████████████ in the Global

Agreements, to the extent they concerned ETRI Patents, ████████████████

█████████████████████████████. (Ebert Aff. Exs. B – H.)

    21.    The ETRI/Acacia Agreements ███████████████████

█████████████████████████. (Ebert Aff., Ex. A, at 1 and Ex. A.)

    Acacia's Response to No. 21: **Disputed.** ████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████ (Ebert Aff., Ex. A at "Exhibit A.")

    22.    After entering into the ETRI/Acacia Agreements, Acacia entered into

agreements in which it granted two companies headquartered in the Republic of Korea,

████████████████████████████████████████████████

█████████████████████████. (Ebert Aff., Exs. D and E.)

    Acacia's Response to No. 22: **Disputed**. Under each of the ████████████

Global Agreements, Acacia ████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████. Acacia never asserted ETRI Patents against

██████████████ through an enforcement action or otherwise.  (Vella Decl. ¶¶ 27 – 33;

Ebert Aff., Ex. D at §§ A2.1, A2.2 and Sub-Exhibit A-1; Ex. E  at §§ A.2.1, A2.2.)

23.    Acacia has not shared with ETRI any of the fees that Acacia received under

the Third-Party Agreements.

Acacia's Response to No. 23:  **Disputed**.  AES shared with ETRI the Net Proceeds

received from agreements with Broadcom and Ericsson.  (Vella Decl. ¶ 10.)

24.    Section 1.5 of the Agreements provides:

> Subject to the limitations set forth in Exhibit A with respect to
> "Excluded Parties" and the limitations set forth in Exhibit C with
> respect to "Existing Agreements", the grant to APAC of the exclusive
> right and license under the Patents herein shall be exclusive with
> respect to any and all Exclusive Parties (as defined below) and APAC
> shall have the sole and exclusive right under the Patents to deal with
> one or more Exclusive Parties in any and all matters relating to the
> Patents, including without limitation any and all direct and indirect
> offers for sale and sales of products and services, in whole or in part,
> covered by the Patents to such Exclusive Parties. The term "Exclusive
> Party" shall mean:
>
>> (a) a declaratory judgment plaintiff or an infringement
>> defendant under any of the Patents; or
>> (b) a party infringing any claim from any of the Patents; or
>> (c) a party with which APAC has initiated or undertaken
>> licensing communications, discussions and/or negotiations or
>> otherwise asserted any of the Patents against, provided that an
>> Exclusive Party shall be deemed to include any and all of its
>> affiliates.

(Ebert Aff., Ex. A at § 1.5.)

25.    Section 3.3 of the Agreements states, in part, that:

> All amounts payable to [ETRI] with respect to Net Proceeds,
> if any, shall be due within thirty (30) calendar days after the
> end of each calendar quarter (i.e. the 31st March, the 30th June,
> the 30th September and the 31st December of each year).
> Within thirty (30) calendar days after the end of each quarter
> that APAC Costs are incurred or Total Recoveries are
> received, APAC will provide Licensor with a report of Total

> Recoveries, APAC Costs and Net Proceeds, if any, for such
> calendar quarter.  Licensor shall have the right to audit such
> reports in accordance with Section 5.2 below.

(Ebert Aff., Ex. A at § 3.3.)

26.     Section 4.1.4 of the Agreements states:

> [E]xcept for the Existing Agreements set forth in Exhibit C,
> [ETRI] has not assigned, licensed or cross-licensed, granted
> covenants not to sue, transferred or otherwise conveyed to any
> other person or entity other than the parties listed in Exhibit A
> any of its rights, title, claims, interest or privileges with
> respect to the Patents.

(Ebert Aff., Ex. A at § 4.1.4.)

27.     Section 6.1 of the Agreements states, in part, that:

> Subject to the terms and conditions of this Agreement,
> [Acacia] will use its good faith efforts to pursue licensing and
> enforcement of the [ETRI] Patents at its expense.  Subject to
> the limitations with respect to the Excluded Parties and
> Existing Agreements as set forth in Exhibit A and Exhibit C
> hereto, [Acacia] will attempt to negotiate licenses with
> companies that [Acacia] believes may be infringing the
> [ETRI] Patents.

(Ebert Aff., Ex. A at § 6.1.)

28.     Section 6.2 of the Agreements states, in part, that:  "Subject to the limitations

with respect to Excluded Parties and Existing Agreements as set forth in Exhibit A and

Exhibit C attached hereto, [Acacia] may, in its sole judgment, decide to institute enforcement

actions against any or all of the companies that [Acacia] believes are infringing the [ETRI]

Patents."  (Ebert Aff., Ex. A at § 6.2.)

29.     Exhibit A to the Agreements provides, in part:  "For as long as this

Agreement remains in effect, [Acacia] shall not at any time pursue licensing of the Patents or

institute enforcement actions with respect to the Patents against the Excluded Parties as set

forth below."  (Ebert Aff., Ex. A at "Exhibit A.")

30.     Acacia assigned its rights and obligations under the second Agreement to

AES.  Acacia assigned its rights rights and obligations under the first Agreement to another

of its wholly-owned subsidiaries, Satellite Access Technologies, LLC ("SAT").  (Vella Decl.

¶ 8.)

31.      On or around January 14, 2011, AES filed a civil action alleging

infringement of certain ETRI Patents against several companies in the U.S. District Court for

the Eastern District of Texas, entitled *Advanced Encoding Solutions, LLC v. Broadcom*

*Corporation, et al.*, No. 6:11-cv-24.  As a result of settlements in that action, AES received

collective "Total Recoveries" of ███████ from settling defendants Broadcom and Ericsson,

and realized "Net Proceeds" of ██████ as those terms are defined in the Agreements.

AES allocated 50% of that amount, or ██████, to ETRI and paid ETRI ██████ after

withholding taxes of 15% of ETRI's portion as required under the Agreements.  (Vella Decl.

¶ 10.)

32.     AES did not file any other actions alleging infringement of ETRI Patents and

did not otherwise license or enforce ETRI Patents against third parties.  As a result, AES did

not receive any further Total Recoveries.  (Vella Decl. ¶ 10.)

33.     SAT did not assert any ETRI Patents against any third parties through an

enforcement action or otherwise, and as a result did not receive any Total Recoveries.  (Vella

Decl. ¶ 11.)

34.     The purpose of each Global Agreement was ████████████

████████████████████████████████████████

████████████████████████████████████████



█████████ (Vella Decl. ¶ 12.)

35.     Acacia's negotiation of the ████ Global Agreement arose from or involved pursuit of ████ for infringement of other patents in some of Acacia's other portfolios, including patents concerning application server technology and computer network management.  (Vella Decl. ¶ 13.)

36.     Acacia did not believe that ████ manufactured or sold products that potentially infringed any ETRI Patents.  Acacia never asserted any of the Patents against ████ through an enforcement action or otherwise.  The patents that Acacia presented to ████ during negotiations as those it believed Oracle infringed did not include any ETRI Patents.  (Vella Decl. ¶ 17.)

37.     On March 9, 2010, Acacia sent its notice of acceptable completion of due diligence to ETRI under the parties' first Agreement.  (Vella Decl. ¶ 15, Ex. C.)

38.     Following the second amendment to the ████ Global Agreement on March 31, 2010, █████████████████████ ████████.  (Vella Decl. ¶¶ 13, 16, Ex. B.)

39.     None of the proceeds Acacia received under the ████ Global Agreement were received as a result of any licensing or enforcement of ETRI Patents.  (Vella Decl. ¶ 18.)

40.     On or around April 14, 2010, Acacia proposed adding Section 4.3 to the second Agreement being negotiated with ETRI.  The proposed Section 4.3 stated:

> Licensor acknowledges that because of a preexisting agreement with one or more third parties including its Related Entities ("Third Party Licensee"), upon Acceptable Completion, such Third Party Licensee will obtain or will

> be granted, either a license and/or a covenant not to sue under the Patents. For the purposes of this Section 4.3, the term "Related Entities" shall mean any entity, including parent companies and majority owned subsidiaries, now or hereafter acquired or formed that is directly or indirectly controlled by such Third Party Licensee, is under common control with such Third Party Licensee, or an entity that controls such Third Party Licensee, as well as all predecessors or successors of such entities.

(Vella Decl. ¶ 19, Ex. D.)

41.     On or around April 14, 2010, representatives of Acacia and ETRI had a call to discuss Acacia's proposed Section 4.3.  Acacia identified Oracle as the company referenced in Section 4.3 and explained that the Oracle Global Agreement did not impact Acacia's obligations under the Agreements because Acacia did not believe Oracle was infringing ETRI Patents.  Acacia communicated its concern that even if it were correct that Oracle did not infringe ETRI Patents, ETRI would later use the absence of Section 4.3 to incorrectly claim that Acacia owed ETRI proceeds received under the Oracle Global Agreement anyway.  ETRI assured Acacia that it understood and that ETRI would not demand any proceeds that Acacia received from companies that Acacia did not believe were infringing ETRI Patents (Vella Decl. ¶ 20.)

42.     Following the call, ETRI's representative stated in an e-mail to Acacia:

> As for the added section 4.3, I completely understand your background.  But, I think it might delay the process of getting approval of our President even though it does not impact anything.  In per Agreement [sic], APAC will have exclusive right to grant sublicense except the companies of Exhibit A/C.  Accordingly, I don't think we need to include the 4.3 in the agreement.  Practically, if you don't want to enforce against some companies, ETRI will have no way to enforce against them.  The case you are concerned about will never happen.

(Vella Decl. ¶ 21, Ex. E.)

43.     Acacia's negotiations with ███████ arose from or involved pursuit of ██████ for infringement of other patents in some of Acacia's other portfolios, including patents concerning, among other things, smartphone technology.  (Vella Decl. ¶ 23.)

44.     Acacia never believed that ███████ manufactured or sold products that potentially infringed any ETRI Patents.  Acacia never asserted any of the Patents against ██████ through an enforcement action or otherwise.  The patents that Acacia presented to ██████ during negotiations as those it believed ███████ infringed did not include any ETRI Patents.  (Vella Decl. ¶ 25.)

45.     None of the proceeds Acacia received under the ███████ Global Agreement were received as a result of any licensing or enforcement of ETRI Patents. (Vella Decl. ¶ 26.)

46.     Acacia's negotiations with ███████ arose from or involved pursuit of ██████ for infringement of other patents in some of Acacia's other portfolios, including patents concerning, among other things, power management in notebook computers. (Vella Decl. ¶ 27.)

47.     Acacia never believed that ███████ manufactured or sold products that potentially infringed any ETRI Patents.  Acacia never completed an analysis of ██████ for potential infringement of the Patents because ██████ to Acacia's Agreements with ETRI stated that Acacia ███████████████████████ ████████████████████████████████ ██████████████████ Acacia  never asserted the Patents against ██████ through an enforcement action or otherwise.  The patents that Acacia presented

to ███████ during negotiations as those it believed ██████ infringed did not include

any ETRI Patents.  (Vella Decl. ¶ 29; Ebert Aff., Ex. A at "Exhibit A.")

48.     None of the proceeds Acacia received under the ██████ Global

Agreement were received as a result of any licensing or enforcement of ETRI Patents.

(Vella Decl. ¶ 30.)

49.     Acacia's negotiations with ██████ arose from or involved pursuit of

███████ for infringement of patents in some of Acacia's other portfolios, including

patents concerning semiconductor memory technology.  (Vella Decl. ¶ 31.)

50.     Acacia never believed that ██████ manufactured or sold products that

potentially infringed any ETRI Patents.  Acacia never completed an analysis of ███████

for potential infringement of the Patents because ██████ to Acacia's Agreements with

ETRI stated that Acacia ████████████████████████████

████████████████████████████████

███████████████████ Acacia never asserted ETRI Patents against ████

████ through an enforcement action or otherwise.  The patents that Acacia presented to

██████ during negotiations as those it believed ██████ infringed did not include

any ETRI Patents.  (Vella Decl. ¶ 32; Ebert Aff., Ex. A at "Exhibit A.")

51.     None of the proceeds Acacia received under the ██████ Global

Agreement were received as a result of any licensing or enforcement of ETRI Patents.

(Vella Decl. ¶ 33.)

52.     Acacia's negotiations with █████ arose from or involved pursuit of █████

for infringement of other patents in some of Acacia's other portfolios, including patents

concerning, among other things, disk drive interface technology.  (Vella Decl. ¶ 34.)

20

53.     Acacia never believed that ███ manufactured or sold products that potentially infringed any ETRI Patents.  Acacia never asserted ETRI Patents against ███ through an enforcement action or otherwise.  The patents that Acacia presented to ███ during negotiations as those it believed ███ infringed did not include any ETRI Patents.  (Vella Decl. ¶ 36.)

54.     None of the proceeds Acacia received under the ███ Global Agreement were received as a result of any licensing or enforcement of ETRI Patents.  (Vella Decl. ¶ 37.)

55.     Acacia's negotiations with ███ arose from or involved pursuit of ███ for infringement of several other patents from Acacia's other portfolios, including those concerning orthopedics and sports medicine.  (Vella Decl. ¶ 38.)

56.     Acacia never believed that ███ manufactured or sold products that potentially infringed any ETRI Patents.  Acacia never asserted the Patents against ███ through an enforcement action or otherwise.  The patents that Acacia presented to ███ during negotiations as those it believed ███ infringed did not include any ETRI Patents.  (Vella Decl. ¶ 39.)

57.     None of the proceeds Acacia received under the ███ Global Agreement were received as a result of any licensing or enforcement of ETRI Patents.  (Vella Decl. ¶ 40.)

58.     Acacia's negotiations with ███ arose from or involved pursuit of ███ for infringement of patents in Acacia's other portfolios, including those concerning smartphones and related wireless and mobile device technologies.  (Vella Decl. ¶ 41.)

59.     Acacia did not license any patents to ███ under the ███ Global

20

Agreement.  Acacia granted to ███ among other things, ██████████████

██████████████████████████████████████████████████

██████████████████████. (Vella Decl. ¶ 42; Ebert Aff., Ex. H at

§ 2.2.)

     60.    Acacia never believed that ████ manufactured or sold products that

potentially infringed any ETRI Patents.  Acacia never pursued ████ for infringement of

the Patents through an enforcement action or otherwise.  (Vella Decl. ¶ 43.)

     61.    None of the proceeds Acacia received under the ████ Global Agreement

were received as a result of any licensing or enforcement of ETRI Patents.  (Vella Decl. ¶

44.)


Dated:  July 1, 2016         By:  */s/ Travis P. Brennan*

           **STRADLING, YOCCA, CARLSON, & RAUTH, P.C.**
           Marc J. Schneider
            mschneider@sycr.com
           Douglas Q. Hahn
            dhahn@sycr.com
           Travis P. Brennan (*Admitted Pro Hac Vice*)
            tbrennan@sycr.com
           660 Newport Center Drive, Suite 1600
           Newport Beach, CA 92660-6422
           Telephone:  (949) 725-4000
           Facsimile:  (949) 725-4100


           **DAVIS & GILBERT LLP**
           Michael C. Lasky
            mlasky@dglaw.com
           Neal H. Klausner
            nklausner@dglaw.com
           1740 Broadway
           New York, NY  10019
           Telephone: (212) 468-4800
           Facsimile: (212) 468-4888

         Attorneys for Defendant Acacia Research Group, LLC

**CERTIFICATE OF SERVICE**

I certify that on July 1, 2016, the foregoing document:

**DEFENDANT ACACIA RESEARCH GROUP, LLC'S RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

was served electronically on all parties or their counsel of record.


*s/ Travis P. Brennan*
Travis P. Brennan