UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X
                                        :

ELECTRONICS AND             :
TELECOMMUNICATIONS RESEARCH   :
INSTITUTE,                        :
                                          :
                     Plaintiff,    :
                                          :
           - against -          :
                                          :
ACACIA RESEARCH GROUP, LLC,    :
                                          :
                    Defendant.   :
                                          :
---------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/1/2017

15-CV-3419 (VSB)

**MEMORANDUM & OPINION**

Appearances:

David G. Ebert
Evan T. Raciti
Ingram Yuzek Gainen Carroll & Bertolotti, LLP
New York, New York
*Counsel for Plaintiff*

Marc J. Schneider
Douglas Q. Hahn
Travis P. Brennan
Stradling, Yocca, Carlson, & Rauth, P.C.
Newport Beach, California

Michael L. Lasky
Neal H. Klausner
Davis & Gilbert LLP
New York, New York
*Counsel for Defendant*

VERNON S. BRODERICK, United States District Judge:

       Plaintiff Electronics and Telecommunications Research Institute ("Plaintiff" or "ETRI")

brings this action against Defendant Acacia Research Group, LLC ("Defendant" or "Acacia")

asserting claims for breach of contract, breach of the implied covenant of good faith and fair

dealing, and fraud in the inducement. Before me is ETRI's motion for partial summary

1

judgment as to liability solely with respect to its breach of contract claim. Because ETRI has not demonstrated that it is entitled to judgment as a matter of law with respect to liability on its breach of contract claim, ETRI's motion for partial summary judgment, (Doc. 53), is DENIED.

## I.    Background

### A.  *The Parties*

Acacia and its subsidiaries are in the business of licensing and enforcing patent rights acquired from inventors and other patent holders, (Def.'s 56.1 ¶¶ 1, 2),[1] and Acacia and its subsidiaries presently own or control approximately 9,912 patents, (Vella Decl. ¶ 5).[2] These patents span a wide range of technologies and industries including ceramic hip replacements utilized in orthopedic surgery, smartphone components utilized in consumer electronics, as well as numerous other technologies in fields including wireless networking, communications, aviation, automotive navigation and diagnostics, and super resolution microscopy. (*Id.*)

ETRI is a research institute based in, funded by, and organized under the laws of South Korea. (Def.'s 56.1 ¶ 3.) Many of ETRI's patents relate to software engineering, video encoding, and various types of communications including optical, radio, cable and satellite. (Ebert Aff. Ex. A at Ex. B.)[3]

---

[1] Contrary to this assertion, ETRI claims that Acacia "licenses and enforces patents on behalf of patent holders." (Pl.'s 56.1 ¶ 1.) "Pl.'s 56.1" refers to Plaintiff's Statement of Undisputed Material Facts, filed May 19, 2016. (Doc. 56.) "Def.'s 56.1" refers to Defendant's Response to Plaintiff's Statement of Undisputed Material Facts, dated July 1, 2016. (Doc. 70.) I note that Defendant's submission contained additional statements of facts that Plaintiff did not oppose.

[2] "Vella Decl." refers to the Declaration of Matthew Vella in Support of Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment, dated June 30, 2016. (Doc. 69.)

[3] "Ebert Aff." refers to the Affirmation of David G. Ebert in Support of Plaintiff's Motion for Partial Summary Judgment, dated May 18, 2016. (Doc. 55.) Annexed as Exhibit A to the Ebert Affirmation are copies of the two agreements between ETRI and Acacia, each titled Exclusive License Agreement (jointly referred to as the "ETRI/Acacia Agreements" or "Agmts.").

### B. The ETRI/Acacia Agreements

The ETRI/Acacia Agreements have effective dates of January 14, 2010 and May 7, 2010, respectively. (Def.'s 56.1 ¶ 4.) The two agreements relate to distinct sets of patents, but contain identical substantive provisions. (*See* ETRI Mem. 1 n.2.)[4] Pursuant to the ETRI/Acacia Agreements, Acacia acquired "all substantial rights" in approximately fifty-four U.S. patents and ninety-two foreign patents that were owned by ETRI (collectively, the "ETRI Patents"). (Def.'s 56.1 ¶¶ 4, 5; Vella Decl. ¶ 7.) The ETRI Patents relate to optical, radio, cable and satellite communications systems, and also video encoding technology. (Vella Decl. ¶ 7.)

Section 1.1 of the ETRI/Acacia Agreements, which is titled "Exclusive License", states in pertinent part that

> [ETRI] grants to [Acacia] all substantial rights in and to the [ETRI] Patents including the worldwide, exclusive right and license under the [ETRI] Patents to make, have made, use, import, offer or sell products or services covered by the [ETRI] Patents, including the exclusive right to grant sublicenses, to sue for and collect past, present and future damages and to seek and obtain injunctive or any other relief for infringement of the [ETRI] Patents.

(Agmts. § 1.1.) Section 1.5 of the ETRI/Acacia Agreements is titled "Exclusivity to [Acacia]" and states that ETRI grants to Acacia "the sole and exclusive right under the [ETRI] Patents to deal with one or more Exclusive Parties in any and all matters relating to the [ETRI] Patents." (Agmts. § 1.5.) The term "Exclusive Parties", in turn, is defined as:

> (a) a declaratory judgment plaintiff or an infringement defendant under any of the [ETRI] Patents; or
>
> (b) a party infringing any claim from any of the [ETRI] Patents; or
>
> (c) a party with which [Acacia] has initiated or undertaken licensing communications, discussions and/or negotiations or otherwise asserted any of the [ETRI] Patents against, provided that an Exclusive Party shall

---

[4] "ETRI Mem." refers to the Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment, submitted May 18, 2016. (Doc. 54.)

be deemed to include any and all of its affiliates.

(*Id*.)

In consideration for ETRI's grant of the exclusive license in the ETRI Patents to Acacia as set forth at Section 1 of the ETRI/Acacia Agreements, ETRI was entitled to receive from Acacia 50% of Net Proceeds which the ETRI/Acacia Agreements define as "Total Recoveries less [Acacia's] Costs."  (Def.'s 56.1 ¶¶ 6-8; Agmts. § 3.1.)  The term "Total Recoveries" is defined as "all amounts actually received by [Acacia] from the licensing and enforcement of the [ETRI] Patents including all licensing proceeds and recoveries from any lawsuits or settlements." (*Id*.)  "[Acacia's] Costs" are defined as "all costs and expenses incurred with third parties by [Acacia] in connection with prosecuting, maintaining, licensing, enforcing or defending the [ETRI] Patents . . . ."  (*Id*.)

Section 6 of the ETRI/Acacia Agreements is titled "ENFORCEMENT OF PATENT RIGHTS AND COOPERATION", and Section 6.1, which is titled "Good Faith", states in pertinent part that

> Subject to the terms and conditions of this Agreement, [Acacia] will use its good faith efforts to pursue licensing and enforcement of the [ETRI] Patents at its expense.  Subject to the limitations with respect to the Excluded Parties and Existing Agreements as set forth in Exhibit A and Exhibit C hereto, [Acacia] will attempt to negotiate licenses with companies that [Acacia] believes may be infringing the [ETRI] Patents.

(Agmts. § 6.1.)  Section 6.2 of the ETRI/Acacia Agreements is titled "Enforcement Litigation" and states in pertinent part

> Subject to the limitations with respect to Excluded Parties and Existing Agreements as set forth in Exhibit A and Exhibit C attached hereto, [Acacia] may, in its sole judgment, decide to institute enforcement actions against any or all of the companies that [Acacia] believes are infringing the [ETRI] Patents.  [Acacia] shall have the exclusive right to bring suit to enforce the [ETRI] Patents.  Notwithstanding anything to the contrary in Section 1.5 of the [ETRI/Acacia Agreements], [Acacia] agrees not to proactively license the [ETRI] Patents to or initiate an enforcement action with respect to any

of the [ETRI] Patents against the Excluded Parties set forth in Exhibit A and Existing Agreements set forth in Exhibit C attached hereto.

(Agmts. § 6.2.)

In April 2010, ETRI and Acacia were negotiating the second of the ETRI/Acacia Agreements. (Pl.'s 56.1 ¶ 40.) As set forth in an email sent on April 14, Acacia proposed including a new provision as Section 4.3 to the second of the ETRI/Acacia Agreements, which provided that

Licensor acknowledges that because of a preexisting agreement with one or more third parties including its Related Entities ("Third Party Licensee"), upon Acceptable Completion, such Third Party Licensee will obtain or will be granted, either a license and/or a covenant not to sue under the Patents. For the purposes of this Section 4.3, the term "Related Entities" shall mean any entity, including parent companies and majority owned subsidiaries, now or hereafter acquired or formed that is directly or indirectly controlled by such Third Party Licensee, is under common control with such Third Party Licensee, or an entity that controls such Third Party Licensee, as well as all predecessors or successors of such entities.

(*Id*.) Representatives from ETRI and Acacia who were negotiating the second of the ETRI/Acacia Agreements discussed the proposed Section 4.3 during a telephone call on or about April 14. (*Id*. ¶ 41.) During the telephone call, representatives from Acacia explained their concern that, without the inclusion of the proposed Section 4.3, ETRI could claim that Acacia owed ETRI its share of Net Proceeds from revenue that Acacia receives in connection with the Global Agreements.[5] (*Id*.) Following the telephone call, a representative from ETRI stated in an email to the Acacia representatives that

As for the added section 4.3, I completely understand your background. But, I think it might delay the process of getting approval of our President even though it does not impact anything. In per Agreement [sic], [Acacia] will have exclusive right to grant

---

[5] "Global Agreements" refers to agreements entered into between 2009 and 2013 by Acacia with, among others, Oracle Corporation, Microsoft Corporation, Samsung Electronics Co. Ltd., Cisco Systems, Inc., (individually "Global Agreement"). (Def.'s 56.1 ¶ 10.)

> sublicense except the companies of Exhibit A/C. Accordingly, I don't think we need to include the 4.3 in the agreement. Practically, if you don't want to enforce against some companies, ETRI will have no way to enforce against them. The case you are concerned about will never happen.

(*Id*. ¶ 42.) ETRI and Acacia agreed not to include the proposed Section 4.3 in the second of the ETRI/Acacia Agreements. (*Id*.) Acacia claims that but for the assurances set forth in the April 14 email, Acacia would not have entered into the second of the ETRI/Acacia Agreements. (Vella Decl. ¶ 22.)[6]

### C. The Global Agreements

As set forth in each Global Agreement, Acacia granted to certain counterparties various rights in different patent portfolios owned or controlled by Acacia and its subsidiaries. (Def.'s 56.1 ¶ 10.) In addition, in each Global Agreement—with the exception of the agreements with Broadcom and Ericsson to whom Acacia licensed the ETRI patents—Acacia covenanted not to sue the counterparty under the ETRI Patents or hundreds of other patents (collectively, "Covenants"). (*Id*. ¶ 11.)

### II.    Procedural History

ETRI commenced this action by filing its Complaint on May 1, 2015, (Doc. 1), and Acacia filed its Answer on June 25, (Doc. 9). I held an initial pre-trial conference on January 22, 2016. That same day I issued an order granting ETRI leave to file an Amended Complaint, (Doc. 26), and entered the case management plan and scheduling order, (Doc. 27). ETRI filed its Amended Complaint on March 11, (Doc. 40), and Acacia filed its Answer to the Amended Complaint on March 31, (Doc. 43).

---

[6] I do not rely on the negotiations related to the second ETRI/Acacia Agreement in reaching the holding here. *See infra* footnote 8.

On February 19, 2016, ETRI filed a pre-motion letter indicating its intention to file a motion for partial summary judgment, (Doc. 32), and Acacia submitted its letter in opposition to the pre-motion letter concerning ETRI's anticipated motion on February 24, (Doc. 34). I held a pre-motion conference on March 11, during which I granted ETRI leave to file its motion for partial summary judgment and set a briefing schedule. ETRI filed its motion for partial summary judgment on May 19, (Doc. 53), along with its memorandum of law in support, (Doc. 54), the Affirmation of David Ebert with exhibits, (Doc. 55), and its Local Civil Rule 56.1 statement of undisputed facts, (Doc. 56). On July 1, Acacia filed a letter requesting oral argument on ETRI's motion for partial summary judgment. (Doc. 65.) On July 6, Acacia filed its memorandum of law in opposition to ETRI's motion for partial summary judgment, (Doc. 67), along with the Declaration of Travis P. Brenan with an exhibit, (Doc. 68), the Declaration of Matthew Vella with exhibits, (Doc. 69), and its Local Civil Rule 56.1 counterstatement of undisputed facts, (Doc. 70). ETRI filed its reply memorandum of law on August 1. (Doc. 74.)

III.   **Legal Standard**

Summary judgment is appropriate when "the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see* Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.*

On a motion for summary judgment, the moving party bears the initial burden of

establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256, and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000). To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

Finally, in considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal citations and quotation marks omitted); *see also Matsushita*, 475 U.S. at 587. "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

## IV.    Discussion

ETRI and Acacia both assert that the terms of the ETRI/Acacia Agreements are unambiguous.  (Reply 10; Acacia Mem. 13.)[7]  They, however, put forward two different and conflicting interpretations regarding the intended meaning of "license" and "licensing" as those terms are used in the ETRI/Acacia Agreements.  Both parties agree that I should interpret the ETRI/Acacia Agreements under New York law.

### A.  Applicable Law

Under New York law, "the initial interpretation of a contract 'is a matter of law for the court to decide.'"  *K. Bell & Assoc., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996) (quoting *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir. 1996)).  When interpreting an agreement, the court's "primary objective is to give effect to the intent of the parties as revealed by the language of their agreement.  The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions."  *Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., N.A.*, 773 F.3d 110, 114 (2d Cir. 2014) (alterations and citations omitted); *Mastrovincenzo v. City of New York*, 435 F.3d 78, 104 (2d Cir. 2006) (emphasizing that under New York law, the "cardinal principle for the construction and interpretation of . . . all contracts . . . is that the intentions of the parties should control.  Unless otherwise indicated, words should be given the meanings ordinarily ascribed to them and absurd results should be avoided").

The "threshold question" in the court's interpretation of an agreement is whether or not

---

[7] "Reply" refers to the Reply Memorandum of Law in Further Support of Plaintiff's Motion for Partial Summary Judgment, submitted July 29, 2016.  (Doc. 74.)  "Acacia Mem." refers to Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment, submitted July 6, 2016.  (Doc. 67.)

the terms are ambiguous. *See e.g.*, *JA Apparel Corp. v. Abbud*, 568 F.3d 390, 397 (2d Cir. 2009). "Ambiguity is determined by looking within the four corners of the document, not to outside sources . . . ." *Id.* at 396 (quoting *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998)). Under New York law, a contract is ambiguous if its terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Chesapeake Energy Corp.*, 773 F.3d at 114 (quoting *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010)). "No ambiguity exists where the contract language has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.* (alteration in original). "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." *Law Debenture Trust Co. of N.Y.*, 595 F.3d at 467 (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)). If the court finds that the contract is unambiguous, "the intent of the parties must be found within the four corners of the contract" and the court should interpret the contract without the aid of extrinsic evidence. *Chesapeake Energy Corp.*, 773 F.3d at 114 (citation omitted).

### B. Application

With this analytic framework in mind, I first review the text of the ETRI/Acacia Agreements without regard to any extrinsic evidence to determine whether or not they are unambiguous. The agreements are not necessarily ambiguous because they are imperfectly drafted or because the parties urge different interpretations. Instead, the test for ambiguity is

whether there exists a reasonable construction of the contract language that affords a definite and precise meaning, and no other reasonable construction. *See Chesapeake Energy Corp.*, 773 F.3d at 114. I have carefully examined the ETRI/Acacia Agreements and, for the reasons set forth below, find them to be unambiguous with respect to the parties' intended meaning of "license" and "licensing." In addition, I find that Acacia's interpretation is consistent with the parties' intended meaning as expressed by the plain language of the ETRI/Acacia Agreements.[8]

Under ETRI's interpretation, the ETRI/Acacia Agreements would require Acacia to pay ETRI 50% of the Net Proceeds from any licensing of the ETRI Patents, regardless of whether or not such licensing relates to pursuit of infringement of the ETRI Patents. (ETRI Mem. 15-16.)[9] Under Acacia's interpretation, Acacia is required to pay ETRI 50% of the Net Proceeds from licensing of the ETRI Patents if such licensing relates to Acacia pursuing infringement of the ETRI patents. (Acacia Mem. 13.) Stated differently, according to Acacia, the parties intended that only licensing in pursuit of infringement would trigger Acacia's payment obligations under the ETRI/Acacia Agreements. I find that Acacia's interpretation is consistent with the parties' intent "as revealed by the language of their agreement[s]." *Chesapeake Energy Corp.*, 773 F.3d

---

[8] Because I find the relevant provisions of the ETRI/Acacia Agreements to be unambiguous, I do not address the parties' arguments that rely on extrinsic evidence. *See Law Debenture Trust Co.*, 595 F.3d at 466 (noting that "[e]xtrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous" (quoting *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002))). However, ETRI's reliance on the "whereas" clause in the Global Agreements to support its interpretation of the ETRI/Acacia Agreements, (ETRI Mem. 17-18), is not only a reference to extrinsic evidence it also does not support ETRI's interpretation. *See Aramony v. United Way of Am.*, 254 F.3d 403, 413 (2d Cir. 2001) (reiterating that "although a statement in a 'whereas' clause may be useful in interpreting an ambiguous operative clause in a contract, 'it cannot create any right beyond those arising from the operative terms of the document'" (quoting *Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 103 (2d Cir. 1985))). Indeed the terms of the Global Agreements rebut ETRI's interpretation. For example, Acacia agreed to provide a license in the Ericsson and Broadcom Global Agreements, (Pl.'s 56.1 ¶ 11), and agreed to provide a covenant not to sue in other Global Agreements, (*id.*); therefore, contrary to ETRI's assertion that licenses and covenants not to sue are equivalents, it appears that Acacia and the counter-parties to the Global Agreements did not consider a license to be indistinguishable from a covenant not to sue.

[9] In addition, ETRI argues that the parties intended "licensing and enforcement" to refer to "two separate and distinct activities for the purposes of the ETRI/Acacia Agreement[s]." (ETRI Mem. 11.) Acacia does not dispute that there exists a distinction between "licensing" and "enforcement", but argues that the parties understood both activities to "entail[] pursuit of infringement." (*See* Acacia Mem. 15, n.1.)

at 113-14 (citation omitted).  Moreover, I find that Acacia's interpretation is the only reasonable

construction of the ETRI/Acacia Agreements for several reasons.

First, Acacia's interpretation is reasonable because it alone adopts the plain meaning of

the words in the ETRI/Acacia Agreements.  *See Chesapeake Energy Corp.*, 773 F.3d at 114

(noting that "words and phrases [in a contract] should be given their plain meaning" (alteration

in original)).  ETRI's interpretation necessarily presumes that the parties intended an additional

legal meaning—besides their plain meaning—of "license" and "licensing".  (*See* ETRI Mem. 19-

21.)  Specifically, ETRI cites several cases and argues that certain courts have found "there is no

substantive difference between an unconditional covenant not to sue and a non-exclusive

license."  (*Id*. at 19 (quoting *Innovus Prime, LLC v. Panasonic Corp.*, No. C-12-660-RMW, 2013

WL 3354390, at *5 (N.D. Cal. July 2, 2013)).)  Based on the reasoning set forth in these cases,

ETRI argues that covenants not to sue constitute "licenses" and therefore Acacia's act of

granting the Covenants constitutes "licensing" within the meaning of the ETRI/Acacia

Agreements.  (*See* ETRI Mem. 19-21.)  Thus, according to ETRI, Acacia owes ETRI unpaid Net

Proceeds[10] because the Global Agreements contain the Covenants.  (*See id*. at 21 (arguing that

that Covenants fall within the "scope of 'licensing and enforcement'" as set forth in the

ETRI/Acacia Agreements).)  Whether or not courts have held that a covenant not to sue is legally

equivalent to a non-exclusive license is beside the point.  (*See* Acacia Mem. 16 n.2.)  Instead,

what guides the inquiry here is what the parties intended as revealed by the plain meaning of

terms they used in the ETRI/Acacia Agreements.  *See Mastrovincenzo*, 435 F.3d at 104

(emphasizing that "words should be given the meanings ordinarily ascribed to them").

Moreover, the cases cited by ETRI are inapposite for at least two reasons:  (1) none of the cases

---

[10] *See supra* at 4 for the meaning of "Net Proceeds" and related terms.

rely upon the equivalence of a non-exclusive license and covenant not to sue as a means of interpreting the contracts at issue; and (2) the recipients of the covenant not to sue were accused of infringing and the court was determining the scope of that party's rights.

As defined in Black's Law Dictionary, "licensing" is "[t]he sale of a license authorizing another to use something (such as computer software) protected by copyright, patent, or trademark." *Black's Law Dictionary* (10th ed. 2014). Nothing within the four corners of the ETRI/Acacia Agreements suggests that the parties intended anything other than this ordinary meaning of "licensing." Specifically, there is no indication that the parties intended a broader meaning of "licensing" that would include not only "[t]he sale of license", *id.*, but also an agreement not to bring litigation, such as a covenant not to sue. Furthermore, ETRI does not claim that the parties intended the terms "license" and "licensing" to include or relate to covenants not to sue. Instead of looking within the four corners of the ETRI/Acacia Agreements for the meaning of "license" and "licensing", *Chesapeake Energy Corp.*, 773 F.3d at 114 (emphasizing that "the intent of the parties must be found within the four corners of the contract"), ETRI points to judicial opinions regarding other agreements to support its interpretation, (*see* ETRI Mem. 19-21).[11] Accordingly, Acacia's interpretation is consistent with the plain meaning of the terms used in the ETRI/Acacia Agreements.

Second, the plain language of Section 6.1 of the ETRI/Acacia Agreements supports Acacia's interpretation whereas no provision supports ETRI's interpretation. Section 6.1 is important in determining the parties' intent because it provides more context than any other provision regarding Acacia's "licensing" activities. Section 6.1 states, in relevant part, that Acacia "will attempt to negotiate licenses with companies that [Acacia] believes may be

---

[11] ETRI's reliance on the Global Agreements is also misplaced, *see supra* footnote 8.

infringing the [ETRI] Patents." (Agmts. § 6.1.) Acacia argues that this language demonstrates the parties' understanding that only licensing in pursuit of infringement would trigger Acacia's payment obligations under Section 3.1. (*See* Acacia Mem. 15 n.1.) In response, ETRI asserts that Section 6.1 merely "sets the *minimum* threshold for when Acacia is required to seek to license the [ETRI] Patents," and Acacia remains free to generate additional Total Recoveries from licensing the "ETRI Patents to companies it does not suspect of infringing." (Reply 2.) ETRI has not identified the language in the ETRI/Acacia Agreements it claims support its interpretation that Section 6.1 "sets the minimum threshold". Moreover, ETRI's argument that Acacia would expend resources attempting to sell licenses to companies that Acacia does not suspect of infringing the ETRI Patents is unpersuasive. In addition, ETRI does not explain why a company that is not infringing, and does not intend to infringe, the ETRI Patents would spend money to purchase a license to do so. Therefore, as discussed further below, ETRI's interpretation would render the ETRI/Acacia Agreements commercially unreasonable.

Third, pursuant to the *ejusdem generis* canon of contract interpretation,[12] Sections 1.1 and 1.5 of the ETRI/Acacia Agreements support the determination that the parties understood "licensing" to be one activity among various activities Acacia could undertake in its pursuit of infringement of the ETRI Patents. This canon stands for the proposition that "the general phrase must be interpreted to refer to items of the same ilk as those specifically listed." *Malmsteen v. Universal Music Group, Inc.*, 940 F. Supp. 2d 123, 133 (S.D.N.Y. 2013) (citing *Travelers' Ins. Co. of Hartford v. Seaver*, 86 U.S. 531, 538 (1873)); *see United States v. Amato*, 540 F.3d 153, 160 (2d Cir. 2008) (noting that "general terms that follow specific ones are interpreted to

___

[12] Black's Law Dictionary defines *ejusdem generis* as "[a] canon of construction holding that when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed." *Black's Law Dictionary* (10th ed. 2014).

embrace only objects of the same kind or class as the specific ones"). The *ejusdem generis* canon applies when a general phrase, e.g., "or any other" or "or otherwise", follows a list of specific terms. Here, Section 1.1 states, in part, that Acacia has the "exclusive right to grant sublicenses, to sue for and collect past, present and future damages and to seek and obtain injunctive *or any other* relief for infringement of the [ETRI] Patents." (Agmts. § 1.1 (emphasis added).) Section 1.5(c) states that Acacia has the exclusive right to "deal with" Exclusive Parties, which are defined to include a "party with which [Acacia] has initiated or undertaken licensing communications, discussions and/or negotiations *or otherwise* asserted any of the [ETRI] Patents against." (Agmts. § 1.5 (emphasis added).)[13] Under the *ejusdem generis* canon, Sections 1.1 and 1.5(c) support Acacia's interpretation that "licensing" is an activity that is "of the same ilk", *Malmsteen*, 940 F. Supp. 2d at 133, as seeking "relief for infringement of the [ETRI] Patents" and "assert[ing] the [ETRI] Patents against" a party, (Agmts. §§ 1.1, 1.5(c)).

Fourth, ETRI's interpretation is unreasonable because it requires inserting an additional payment provision that is not contemplated in the ETRI/Acacia Agreements. *See Bailey v. Fish & Neave*, 8 N.Y.3d 523, 528 (2007) (emphasizing that "courts may not by construction add or excise terms" (citation omitted)). The ETRI/Acacia Agreements set forth a single provision for the parties to share profits, i.e., ETRI and Acacia agreed to share Net Proceeds 50%. (*See* Amgts. § 3.1.) ETRI concedes that it is not entitled to 50% of what Acacia received in connection with the Global Agreements. (ETRI Mem. 17.) "Rather, ETRI simply contends that" it is entitled to "*some* portion" of what Acacia received. (*Id*. (emphasis in original).) The ETRI/Acacia Agreements, however, do not contemplate any such distribution, and ETRI does

---

[13] Based on the fact that Sections 1.5(a) and 1.5(b) reference "infringement" but Section 1.5(c) does not, ETRI claims that "Section 1.5 contemplates that 'licensing' may occur even when the licensee is not 'infringing any claim from any of the [ETRI] Patents.'" (Reply 7.) As already stated, ETRI's assertion that a non-infringing company would buy a license to infringe the ETRI Patents is unpersuasive and commercially unreasonable.

not identify any terms of the ETRI/Acacia Agreements that support such distribution payments or suggest some other basis for them.  When asked how ETRI would calculate what it is owed according to its interpretation of the agreements, counsel for ETRI stated that he was "not sure" and asserted that the "specifics" of what is owed can "be addressed in the damages phase" through expert testimony.  (3/11 Tr. Hr'g 4:15-5:7; *see also* ETRI Mem. 17.)  ETRI misses the point.  This is not an issue of a numerical damages calculation after liability has been determined; rather, the issue is part of and intertwined with determining liability, i.e., ETRI being entitled to such payment under the ETRI/Acacia Agreements.  Neither courts nor experts, however, can add terms to the parties' agreements.  *See Bailey*, 8 N.Y.3d at 528.  In addition, if the parties contemplated that Acacia would owe ETRI money in connection with other streams of revenue—that would be governed by a different profit sharing distribution, e.g., "some portion" of the revenue Acacia receives from granting covenants not to sue—the parties would have included such a provision; however, no such provision exists.

Fifth, ETRI's interpretation must be rejected because it would lead to an absurd result and render the ETRI/Acacia Agreements commercially unreasonable.  *Homeward Residential, Inc. v. Sand Canyon Corp.*, No. 13 Civ. 2107(AT), 2014 WL 2510809, at *9 (S.D.N.Y. May 28, 2014) (stating that "a court must avoid any interpretation that would be absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties").  Counsel for ETRI stated that, under ETRI's interpretation, "a whole bunch of other entities . . . would have the same claim" against Acacia as ETRI is asserting in this action.  (3/11/2016 Tr. Hr'g 7:3-8.)  In addition, Acacia would be required to share with each of its customers a portion of what it receives from the Global Agreements.  (*Id.* at 8:5-10 (confirming that "every single customer or client" of Acacia "would be entitled to a piece" of the revenue generated from the Global

Agreements).)  In addition, the revenues generated by the first ETRI/Acacia Agreement were rather modest when compared to the revenues to Acacia generated by the Global Agreements. Therefore, it does not make sense that Acacia would enter into the second ETRI/Acacia Agreement if that meant sharing the revenues from the Global Agreements with ETRI.  Adopting ETRI's interpretation would thus lead to an absurd and commercially unreasonable result.

**V.**     **Conclusion**

For the reasons stated herein, ETRI's motion for partial summary judgment, (Doc. 53), is DENIED, and Acacia's letter motion for oral argument, (Doc. 65), is denied as moot.  The Clerk of Court is respectfully directed to terminate the motion at Document 53 and the letter motion at Document 65.

SO ORDERED.

Dated: June 1, 2017
     New York, New York

Vernon S. Broderick
United States District Judge